**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 09:46 AM March 13, 2015**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| BRUCE EDWARD KANDEL, | ) | CASE NO. 11-62597 |
| Debtor. | ) | ADV. NO. 12-6003 |
| | ) | JUDGE RUSS KENDIG |
| UNITED STATES TRUSTEE, | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |
| BRUCE EDWARD KANDEL, | ) | |
| Defendant. | ) | |

The United States Trustee for Region 9 ("UST") brought the current adversary case against Bruce Edward Kandel ("Debtor") seeking to deny Debtor's bankruptcy discharge under 11 U.S.C. § 727. Specifically, UST believes Debtor: concealed or transferred assets after filing for bankruptcy with the intent to harm creditors in violation of § 727(a)(2)(B); failed to maintain adequate business records in violation of § 727(a)(3); or failed to obey a court order in violation of § 727(a)(6). Debtor argues that UST has not sufficiently demonstrated he violated any portion of § 727, entitling him to a discharge.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

**Facts**

Debtor is a business owner with extensive trucking industry experience. Debtor started in the trucking business around age eight by sweeping floors and completing other low-level tasks, but moved up the hierarchy, first to mechanic, then driver, and finally business owner. Even after becoming the owner, Debtor nevertheless focused on driving trucks and trailers, leaving the daily management of his businesses to others. While Debtor's businesses were successful for a time, the combination of an expensive divorce, rising gasoline prices, and the "Great Recession" of 2008 pushed Debtor into bankruptcy.

On August 9, 2011, Debtor filed his bankruptcy petition under Chapter 7 of the United States Bankruptcy Code (the "Code"). Debtor's bankruptcy petition listed $755,111.00 in secured claims, $458,817.00 in unsecured priority claims, and $435,394.00 in general unsecured claims, for total debts of $1,649,322.00. Pl.'s Ex. A. Of Debtor's liabilities, $750,000.00 is a divorce judgment, $449,594.00 relates to tax liabilities, $384,000.00 is a secured loan with First National Bank of Dennison ("First National"),[1] $49,000.00 in credit card debt, along with other relatively immaterial debts. Id. Debtor's assets were significantly smaller, with real property valued at $300,000.00 and personal property valued at $636,734.00, the majority of which is Debtor's ownership in various business entities. Id. At the time of filing, Debtor was the 100% owner of the following companies: Bellar-Von Kaenal Trucking, Inc. ("BVK") (bankruptcy petition value of $0.00); Strasburg Leasing Company ("Strasburg Leasing") (bankruptcy petition value of $384,000.00); Ohio Carrier Corporation ("Ohio Carrier") (bankruptcy petition value of $0.00); and STAB LLC ("STAB") (bankruptcy petition value of $218,000.00). Id. BVK is Debtor's operating entity that generated trucking revenue, while Ohio Carrier was the trade name used by BVK. Strasburg Leasing held title to business assets, such as trucks, trailers, and other similar equipment, while STAB held title to the real property where the businesses operated.

In the three years immediately preceding bankruptcy BVK was a large operation, generating average sales of approximately $3.1 million. According to tax records, in 2008 BVK reported $4,267,694.00 in revenue and $4,219,474.00 in expenses, leaving $48,220.00 in taxable income. Pl.'s Ex. F 1. Business soured the following year, as BVK generated $2,492,097.00 in revenue, but after accounting for expenses, lost $172,888.00. Id. at 15. Business rebounded slightly in 2010, but revenues of $2,691,583.00 and expenses of $2,710,771.00 still resulted in an operating loss of $15,783.00. Id. at 27. Debtor filed for bankruptcy the next year.

[1] While this debt is listed as unsecured in Debtor's bankruptcy petition, other evidence, as well as testimony at trial, suggest that the debt was secured by Debtor's business assets. The status of the debt, as either secured or unsecured, is not central to the current § 727 action.

One of Debtor's main liabilities at the time of his bankruptcy filing was a $384,000.00 loan from First National secured by thirty-four of Strasburg Leasing's trucks and trailers. In the months before Debtor's bankruptcy, First National, Debtor, and Christine Kinsey (Debtor's fiancée), began discussing various financial options relating to the First National loan and the associated trailers. Approximately four months before Debtor's bankruptcy filing, Ms. Kinsey created and became the 100% owner of KTS Transportation, LLC ("KTS") and Ohio Carrier, LLC, an entity with a name very similar to Debtor's Ohio Carrier Corporation. Pl.'s Ex. G. After completing negotiations, Debtor, Ms. Kinsey, and First National agreed that Strasburg Leasing would maintain ownership of the tractors and trailers, but lease them to KTS (an arrangement First National hoped would keep its security interest out of Debtor's then ongoing divorce proceeding). Pl.'s Ex. H. KTS would make rent payments to First National. Id. The lease began on August 1, 2011, only eight days before Debtor's bankruptcy filing, but was not memorialized in writing until sometime in December of 2011. Id.; Trial Tr. vol. 1, 45–46. Debtor inaccurately testified that Strasburg Leasing and KTS executed a written lease before Debtor's bankruptcy. Trial Tr. vol. 1, 46–47. After obtaining use of the Strasburg Leasing assets, KTS appeared very similar to BVK, operating out of the same location, using much of the same equipment, and employing 80% of the same staff. Pl.'s Ex. W 12; Trial Tr. vol. 2, 42. Maybe the entities were too similar, as KTS, just like BVK, could not generate sufficient income to make payments on First National's loan. First National repossessed the trucks and trailers and held a public auction in January of 2013. Pl.'s Ex. J. The auction resulted in a total sale price of $426,820.00, allowing $158,976.48 to be distributed to Debtor's creditors after satisfying First National's lien. Id.

A few months after the First National auction, around February or March of 2013, Debtor and Ms. Kinsey, supposedly acting on behalf of KTS, began quietly marketing trucking equipment and supplies located at 6531 McCracken Drive in Dover, Ohio (the "McCracken Property"). The McCracken Property is owned by STAB, one of Debtor's business entities. The evidence presented at trial indicated that the majority of the assets were trucks and trailers in various states of disrepair, with many of the asset's best use as scrap (collectively, the "McCracken Trailers"). Pl.'s Ex. K. Debtor and Ms. Kinsey first negotiated a sale of the McCracken Trailers to William Ziegler, working as an agent for Recycling Concepts, a scrap recycling business. Trial Tr. vol. 1, 57–60. Debtor, Ms. Kinsey, and Mr. Ziegler agreed on a purchase price of $43,000.00 to be paid to KTS. Id. at 159, 167. Before the sale could be finalized, Mr. Ziegler backed-out after conducting research and realizing that many of the McCracken Trailers were tilted in the name of Strasburg Leasing, not KTS. Id. at 162–64. Anne Silagy, the Chapter 7 panel trustee ("Trustee"), only learned of the McCracken Trailers after Mr. Ziegler informed her of the proposed sale. Id. at 57–60, 62–67, 158–62. The McCracken trailers were not listed within Debtor's bankruptcy petition. Debtor asserts that his counsel informed Trustee of the McCracken Trailers, but the court finds the testimony of Trustee and Mr. Ziegler more credible on this point. After learning of the McCracken Trailers, Trustee quickly inserted herself into the sale as a representative of Debtor's bankruptcy estate. Debtor, Recycling Concepts, and Trustee eventually agreed on a $90,000.00 sale price, which included the following assets: approximately sixty-five damaged trailers; twenty-one van trailers; seven semi tractors; six partially disassembled or stripped motor vehicles; eighteen flatbed trailers; and any

other salvage or scrap metal found on the McCracken Property.[2] Pl.'s Ex. L. At least a portion of the trailers sold to Recycling Concepts with Trustee's oversight contained the same registration numbers as the vehicles Debtor and Ms. Kinsey previously attempted to sell outside bankruptcy. Trial Tr. vol. 1, 65–66. The sale price was to be paid directly from Recycling Concepts to Trustee, with the money being used to pay Debtor's bankruptcy creditors. Debtor alleges that the contract between Debtor, Recycling Concepts, and Trustee was originally for $100,000.00, but the theft of ten vehicles (a police report or other substantiating information was never presented to the court) reduced the sale price to $90,000.00. Post-Trial Arg. of Bruce Edward Kandel, Def. 3, ECF No. 92. As of the writing of this opinion, Recycling Concepts has not paid the entire purchase price, and mediation regarding the unpaid balance is ongoing.

Debtor states that KTS owned many of the trailers included within the Recycling Concepts sale. However, the court is unsure when a transfer of assets, if any, occurred between Strasburg Leasing and KTS. At trial, Debtor testified that KTS's use of Strasburg Leasing assets was a lease, without an associated ownership transfer. Therefore, that lease agreement can be excluded as the source of KTS's alleged ownership of Strasburg Leasing assets. Debtor also testified that he transferred ownership of a number of vehicles over to KTS, evidenced by his signature on the back of the associated vehicle title. Trial Tr. vol. 1, 132–33; vol. 2, 56–59, 65–67. Debtor claims he transferred "many" trucks and trailers to KTS to repay Ms. Kinsey for approximately $40,000.00 she loaned to Debtor in an effort to stave off bankruptcy. Post-Trial Arg. of Bruce Edward Kandel, Def. 5. The court has no evidence of Ms. Kinsey's $40,000.00 transfer. Additionally, the exact timing of any vehicle transfer is unclear. Debtor failed to list any Strasburg Leasing transfers to KTS within his bankruptcy petition. Ms. Kinsey testified that she was unsure of when Strasburg Leasing transferred trailer ownership to KTS, but believed it was before Debtor's bankruptcy. Trial Tr. vol. 2, 65–66. Debtor's transfer of title, if any, was not recorded with the State of Ohio. However, before the State of Ohio will issue a title for a previously non-roadworthy vehicle, the vehicle must pass an inspection. Id. at 55–56. According to Ms. Kinsey, the reason certain trucks and trailers officially remained titled to Strasburg Leasing, instead of KTS, was solely due to difficulties in repairing vehicles to a level consistent with Ohio Department of Transportation standards. Id. The court is also unsure of the exact number of trucks and trailers transferred. In various emails between Debtor's counsel and Trustee in late 2013, Debtor asserted that KTS had ownership of between seven and eighteen trailers. Pl.'s Ex. S, T, U. At his § 341 meeting of creditors, Debtor testified that his companies owned between twenty and thirty trucks and trailers. Pl.'s Ex. W 11. At the evidentiary hearing, Ms. Kinsey testified she held title to between approximately thirty-five and forty trailers. Trial Tr. vol. 2, 66. The proposed sale between Debtor and Recycling Concepts included over one-hundred vehicles. Pl.'s Ex. L. Based on the information provided, much of it contradictory, the court is completely incapable of accurately determining Ms. Kinsey's ownership of trailers previously owned by Strasburg Leasing. The court is also unsure of the number of vehicles owned by Debtor or Debtor's businesses on his petition date.

Testimony at the evidentiary hearing also suggests that Debtor has property, in addition to the McCracken Trailers, that was never disclosed to Trustee. For example, Mr. Ziegler

---

[2] Debtor's post-trial brief argues that the McCracken Trailers had little value, as the two highest offers after Recycling Concepts' offer were approximately $4,500.00. However, an asset is worth what someone will pay for it, and Recycling Concepts' purchase prices is indicative of the McCracken Trailers' substantial value.

testified that he was able to sell trailers titled to Strasburg Leasing that were not located on the McCracken Property. Trial Tr. vol. 1, 170–79. Debtor's post-trial brief accuses Mr. Ziegler of stealing over $100,000.00 in assets located outside the McCracken Property that were not part of the contract between Debtor, Trustee, and Recycling Concepts. Post-Trial Arg. of Bruce Edward Kandel, Def. 3–4. Debtor's theft allegations against Mr. Ziegler strongly suggests that Debtor (or one of his business entities) owned significant property in locations never disclosed to Trustee.[3] Additionally, Trustee discovered a 1995 Chevrolet pick-up truck titled to Debtor inside one of the McCracken Trailers that Debtor did not initially disclose in his bankruptcy petition. Trial Tr. vol. 1, 88–91. Debtor explained his lack of disclosure as an oversight due to the pick-up truck's original purchase as a sixteenth birthday present for his son. Trial Tr. vol. 2, 28. Debtor amended his bankruptcy schedules to include the pick-up truck with a $3,152.00 value. Furthermore, when Trustee traveled to the McCracken Property to take inventory of Debtor's assets, she witnessed an individual moving property from the McCracken Property into a trailer also located on the property. Trial Tr. vol. 1, 68–73. While Debtor and Ms. Kinsey both testified that the property being moved did not belong to Debtor, it is another unusual coincidence regarding potential bankruptcy estate property.

The vast majority of the disputes relating to the McCracken Trailers, as well as Debtor's other assets, could have been completely eliminated if Debtor had maintained even mediocre financial records. For years 2006–10, Debtor employed Michael Frantz, an accountant living in California, to complete his federal income tax returns. For normal every-day accounting entries, Debtor utilized his now ex-wife. However, despite filing tax returns with income and expenses in the millions of dollars, Debtor has provided very limited supporting information. See, e.g., Id. at 21, 24–25. The sole detailed fixed asset listing Debtor supplied included only the trucks and trailers secured by the Frist National lien and previously sold at auction. Pl.'s Ex. J. Trustee requested from Debtor, on numerous occasions, a complete fixed asset listing that would allow Trustee to locate, value, and sell all of Debtor's remaining business assets. Debtor was unable or unwilling to provide the information. Trustee also made numerous requests of Mr. Franz for a fixed asset list, but after numerous calls, emails, and faxes, Trustee only received a one page printout specifically identifying six trailers and lumping the remainder of Debtor's assets into a single value. Trial Tr. vol. 1, 24–25. Mr. Franz's document provides no insight into Debtor's financial affairs. The court is also skeptical of a number of Debtor's justifications for his inability to provide the asset list. For example, at different times during the discovery process, Debtor informed Trustee that a roof collapse, a flood, a computer virus in Mr. Franz's computer system, or a computer virus within Debtor's computer system destroyed his records. See, e.g., Pl.'s Ex. W 14–15, 18–19; Trial Tr. vol. 1, 25–27; Post-Trial Arg. of Bruce Edward Kandel, Def. 5. Debtor failed to provide any evidence substantiating these claims. It is incredibly unlikely that both Debtor and Debtor's distant and unreachable accountant would each have their records destroyed by independent events. Similarly perplexing is Debtor's ability to generate certain reports from his allegedly virus-laden accounting software that were not particularly relevant to the bankruptcy proceeding, but the modules with more relevant information, such as payments to vendors or a listing of fixed assets, were inoperable. Trial Tr. vol. 1, 35–36, 40–41.

[3] Debtor spends a significant portion of his post-trial brief accusing Mr. Ziegler of theft and other related crimes. As the court repeatedly stated during trial, any crimes committed by Mr. Ziegler are irrelevant to the question before the court: whether Debtor's actions are sufficient to deny his bankruptcy discharge. The court does note that Mr. Ziegler's potentially illegal actions are relevant to his credibility.

While Debtor had trouble providing many different records, his lack of a fixed asset listing is the most troubling, especially in light of allegations of hidden assets. The trucking industry is capital intensive. One of Debtor's largest expenses is depreciation. As a truck is driven and its mileage increases, the truck's value is also reduced. Depreciation expense, while not an exact mirror of an asset's actual decrease in value, allows a business to recognize asset valuation decreases as a yearly business expense. Debtor's 2008 tax return lists fixed assets with an original purchase price of $6,128,073.00, associated accumulated depreciation of $5,613,823.00, and annual depreciation expense of $259,790.00. Pl.'s Ex. F 9. The information from Debtor's 2009 and 2010 tax returns are similar. It is very troublesome that Debtor, Debtor's accountant, Debtor's ex-wife, Debtor's computer system, and Debtor's hard copy records were all unable to provide support for fixed assets originally purchased for over six million dollars with annual depreciation of over a quarter-million dollars.

While Debtor has been unable to provide detailed financial statements or a fixed asset listing, Debtor did provide personal bank statements and check registers. Trial Tr. vol. 1, 32–34. Debtor also provided information regarding his business banking account, but the business check register was illegible and contained wire transfers without supporting documentation. Id. Debtor also failed to provide bills of sale supporting business expenses. Trustee attempted to use the information provided to reverse engineer Debtor's financial position, but was unable to do so.

In addition to Debtor's failure to provide specific financial information, Debtor also made untrue statements within his bankruptcy petition. Question 18a in Debtor's Statement of Financial Affairs ("SOFA") asks Debtor to list each business entity he holds an interest in, but Debtor failed to list any. Pl.'s Ex. A 31. Similarly, SOFA question 19a asks Debtor to list any company in which he has been an "officer, director, managing executive, or owner of more than 5 percent of the voting equity" within the past six years. Id. at 32. Debtor failed to list any such entities. Id. However, Debtor did disclose his business ownership in Schedule B. Id. at 10. At his § 341 meeting of creditors, Debtor stated that BVK was the "holding company" for all his other business entities. Pl.'s Ex. W 33. Debtor made the same assertion in his federal income tax returns. Trial Tr. vol. 1, 29. Such a representation suggests that the assets of Strasburg Leasing would be tied-up by the liabilities of Debtor's other entities. However, each of Debtor's business entities was an independent company, and Strasburg Leasing had no liabilities, except for the First National loan which was previously satisfied at auction. Debtor also stated at his § 341 meeting of creditors that his businesses had no value above their liabilities. Pl.'s Ex. W 9, 34; Trial Tr. vol. 1, 42. As indicated by the First National auction and the sales agreement between Trustee and Recycling Concepts, Debtor's valuation was materially incorrect. Even though Debtor filed bankruptcy on January 17, 2012, and the First National auction that resulted in significant proceeds to Debtor's bankruptcy estate occurred approximately one year later, the court nevertheless finds it exceedingly unlikely that Strasburg Leasing had no equity as of the petition date. When combining the $100,000.00 sale of Strasburg Leasing assets to Recycling Concepts, Debtor's allegation that Mr. Ziegler stole $100,000.00 in additional assets, and the excess value distributed to Debtor's creditors after the First National auction, the court only becomes more certain that Strasburg Leasing contained significant equity as of the petition date. The sum of these misrepresentation, either intentional or unintentional, could cause a trustee to significantly underestimate the amount of assets available for distribution to creditors.

## Law & Analysis

Several key facts impel an obvious conclusion. Debtor owned a trucking company that grossed in excess of four million dollars in one recent year. In spite of this, Debtor claimed to be unable to produce a fixed asset listing, which would be necessary to calculate depreciation for each and every tax year. Debtor's totally unsupported excuses were of the "dog ate my homework" ilk: roof collapse, flood, and computer virus.[4] Coincidentally, Debtor's accountant, located over 2,000 miles away in California, also experienced unsupported catastrophic computer failures that destroyed the records that had been used to complete tax returns. Roof collapse, flood, and computer virus were said without a hint of irony. Trustee's lack of knowledge as to what assets existed and where they were located caused profound errors and misunderstandings as Trustee attempted to do her job. This caused a bounty of other problems in estate administration as Trustee attempted to locate and sell assets, most of which were literally on wheels. This created many other discharge issues that fortunately the court need not resolve. The record keeping is so fundamentally inexcusable that we need not resolve the abundant finger pointing that ensued between Trustee and Debtor on the other issues spawned by this unexplainable absence of basic records.

The primary purpose of the United States Bankruptcy Code ("the Code") is to give a "fresh start to the honest but unfortunate debtor." Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007) (internal quotation marks omitted); Peters v. Michael (In re Michael), 433 B.R. 214, 220 (Bankr. N.D. Ohio 2010). Central to this policy is the bankruptcy discharge, which prohibits creditors from collecting on many prepetition debts. 11 U.S.C. § 523, 727(a); G & J Invs. v. Zell (In re Zell), 108 B.R. 615, 622 (S.D. Ohio 1989). However, receiving a bankruptcy discharge is not automatic, and § 727(a) lists twelve situations that can result in the complete denial of a debtor's discharge. "The discharge limitations in § 727(a) encourage debtors to give complete and accurate information by furnishing creditors with a vehicle under which abusive debtor conduct can be dealt with by denial of discharge." McDermott v. Roller (In re Roller), 2014 WL 644590, at *7 (Bankr. N.D. Ohio 2014) (citing Lunn Real Estate Invs., LLC v. Ward (In re Ward), 2013 WL 5429767, at *2 (Bankr. E.D. Tenn. 2013) (internal quotation marks omitted)). To effectuate the bankruptcy "fresh start" principle, each discharge exception "should be construed strictly against the creditor and liberally in favor of the debtor [while recognizing] that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." Sheehan & Assocs. PLC v. Lowe, 2012 WL 3079251, at *3 (E.D. Mich. 2012); see also Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000). "Completely denying a debtor his discharge . . . is an extreme step and should not be taken lightly." Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).

When analyzing an action under § 727(a), the burden of proof is initially placed on the party seeking to deny discharge. Fed. R. Bankr. P. 4005; Hunter v. Sowers (In re Sowers), 229 B.R. 151, 156 (Bankr. N.D. Ohio 1998). If a prima facie case is shown, the burden shifts to the debtor to provide evidencing rebutting the claim. In re Sowers, 229 B.R. at 156. "Nevertheless, it is always the party objecting to the discharge who bears the ultimate burden of persuasion, to

[4] Apparently one unlikely disaster was not sufficient to wipe out the records. It took three.

prove by a preponderance of the evidence, that all the statutorily required elements have been met." Id.; In re Keeney, 227 F.3d at 683.

In the current case, UST's amended complaint asserts claims against Debtor for violations of § 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(5), and (a)(6). UST's post-trial brief abandoned or withdrew the claims under § 727(a)(2)(A) and (a)(5). UST's remaining claims accuse Debtors of improperly transferring or concealing bankruptcy estate property in violation of § 727(a)(2)(B), improperly concealing or failing to maintain business records in violation of § 727(a)(3), or failing to obey a court order in violation of § 727(a)(6).

## I. Debtor Failed to Maintain Adequate Business Records Under § 727(a)(3)

The court first turns to UST's argument that Debtor failed to produce adequate records in violation of § 727(a)(3). According to the Code, discharge should be denied if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The overarching goal of § 727(a)(3) is "to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of disclosures requisite for a discharge." Sheehan & Assocs., 2012 WL 3079251, at *3; see also Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992) ("Creditors are not required to risk having the debtor withhold or conceal assets under cover of a chaotic or incomplete set of books or records."); Strzesynski v. Devaul (In re Devaul), 318 B.R. 824, 829 (Bankr. N.D. Ohio 2004). Creditors are not entitled to perfect records, but instead "only enough information to ascertain the debtor's financial condition and track financial dealings with substantial completeness and accuracy for a reasonable time past to present." Turoczy Bonding Co. v. Strbac (In re Strbac), 235 B.R. at 882 (internal quotation marks omitted); see also Mercantile Peninsula Bank v. French (In re French), 499 F.3d 345, 355 (4th Cir. 2007). Because deciding if a debtor's records are sufficient is a fact intensive inquiry, trial courts are given "wide discretion" when making the determination. Dolin v. N. Petrochemical Co. (In re Dolin), 799 F.2d 252, 253 (6th Cir. 1986). Showing a debtor acted with fraudulent intent when failing to maintain or provide adequate records is not an element of § 727(a)(3). Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 70 (1st Cir. 2004); In re Roller, 2014 WL 644590, at *11.

The burden of proving a claim under § 727(a)(3) first rests with the party objecting to discharge, but once a proper showing is made, the burden shifts to the debtor to justify his lack of records. U.S. Tr. v. Zhang (In re Zhang), 463 B.R. 66, 91 (Bankr. S.D. Ohio 2012); In re Devaul, 318 B.R. at 829. Specifically, the party objecting to discharge must provide information surrounding the debtor's financial activities, such as business interests or sources of income, and then specifically allege the records a debtor has concealed, destroyed, mutilated, falsified, or did not properly create. In re Devaul, 318 B.R. at 833; see also D.A.N. Joint Venture v. Cacioli (In re

Cacioli), 463 F.3d 229, 235 (2d Cir. 2006). The next step is similar to causation, as the party objecting to discharge must show how the missing records might allow a more complete view into the debtor's financial condition. In re Devaul, 318 B.R. at 833. While the objecting party's burden will normally be relatively easy to satisfy, the statute's use of "might be ascertained" requires a lenient standard.[5] Creditors are not required to reconstruct a debtor's financial condition from a set of unorganized records. In re Juzwiak, 89 F.3d 424, 428–29 (7th Cir. 1996); In re Roller, 2014 WL 644590, at *14–15.

Once the objecting party has satisfied the above standard, the burden shifts to the debtor to show that his lack of records was "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3); In re Strbac, 235 B.R. at 883; In re Devaul, 218 B.R. at 829. Therefore, the record keeping standard "is a loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved." In re Cacioli, 463 F.3d at 235 (quoting Morris Plan Indus. Bank of N.Y. v. Dreher, 144 F.2d 60, 61 (2d Cir. 1944)). The court has previously illustrated a debtor's record keeping responsibility as a sliding scale, "with one end consisting of large businesses that must maintain in-depth records, and the other end consisting of unsophisticated consumer debtors requiring far less documentation." In re Roller, 2014 WL 644590, at *14. Where a debtor falls on the sliding scale is very important to the amount and sophistication of records a court will require a debtor to produce. "Where the evidence is clear, however, that a debtor purposefully fails to keep books and records from which his financial condition and business transactions might be ascertained in order to perpetuate a fraud upon creditors, a discharge should be denied pursuant to § 727(a)(3)." Covey v. Hallahan (In re Hallahan), 1999 WL 33582620, at *6 (Bankr. C.D. Ill. 1999). A creditor is entitled to written records, as oral testimony is insufficient to overcome a lack of hard-copy documentation. In re Juzwiak, 89 F.3d at 429–30; U.S. Tr. v. Shattuck (In re Shattuck), 2012 WL 2884830, at *2 (Bankr. N.D. Ohio 2012).

---

[5] According to many courts, the party seeking to deny discharge carries their initial burden of showing: "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it *impossible* to ascertain the debtor's financial condition and material business transactions." Meridian Bank, 958 F.2d at 1232 (emphasis added). Many bankruptcy courts have rejected the impossibility prong, noting that it is not supported by the language of the statute. See, e.g., Crocker v. Stiff (In re Stiff), 512 B.R. 893, 897 n.2 (Bankr. E.D. Ky. 2014); In re Devaul, 318 B.R. at 830–33. The Sixth Circuit has not weighed in on the issue. At other times courts have reiterated the "impossibility" prong, but then evaluated the case in a manner not requiring creditors to take every possible step to reconstruct a debtor's finances from substandard records. See e.g., In re French, 499 F.3d at 356; PNC Bank, Nat'l Ass'n v. Buzzelli (In re Buzzelli), 246 B.R. at 97 (noting that a strict impossibility standard would almost always result in a victory for a debtor, as "a creditor, if it expends an infinite amount of time, money, and effort . . . , will likely be able to ultimately ascertain a debtor's financial condition and material business transactions"). Instead of an impossibility standard, many courts have focused on the statute's "might be ascertained" language, which only requires a creditor to show that a debtor has failed to provide records that "might" give a creditor a better view into the debtor's financial situation. In re Devaul, 318 B.R. at 831–32. As is consistent with past opinions, the court will not impose a strict "impossibility" standard. See In re Roller, 2014 WL 644590, at *11–14 (While reiterating the impossibility prong, the court later reasoned that "it is not the job of the court, trustee, or creditor to compile a Debtor's records."). In the current case, Debtor's lack of an accurate fixed asset listing, when coupled with Trustee's efforts in obtaining such a listing, would nevertheless satisfy the impossibility standard.

### A. A Lack of Records from Debtor's Business Entities May Form the Basis for the Denial of Debtor's Individual Bankruptcy Discharge

Debtor believes that the lack of records from his separate business entities cannot form the basis for the denial of his personal discharge. Supporting Debtor's position is an earlier decision in this same case, where the court determined, on UST's motion for summary judgment, that the transfer of corporate property from Debtor's wholly owned corporation was not sufficient to deny Debtor's discharge under § 727(a)(2)(A).[6] The court reasoned that "[g]enerally, corporate property is not property of the estate," but instead "it is a debtor's interest in the entities, such as the stock shares, that are property of the estate." U.S. Tr. v. Kandel (In re Kandel), 2013 WL 310302, at *3 (Bankr. N.D. Ohio 2013); In re Liber, 2012 WL 1835164 (Bankr N.D. Ohio 2012). At summary judgment, UST failed to adequately show equity existed in Debtor's business entities. Therefore, UST's argument that the lease between Strasburg Leasing and KTS was sufficient to deny Debtor's individual discharge failed because "the cursory conclusion that corporate property was property of the debtor, with no legal explanation, is unavailing." In re Kandel, 2013 WL 310302, at *3. UST subsequently abandoned its claim under § 727(a)(2)(A). However, UST now argues that different sections of § 727(a) allow different, and sometimes more expansive, inquiry into the property held by a debtor's wholly owned corporation.

Section 727(a)(3) requires a debtor to provide creditors with records presenting a clear picture of a debtor's "financial condition or business transactions." 11 U.S.C. § 727(a)(3). Whether the business records from an entity owned by a debtor falls within § 727(a)(3) has been the subject of disagreement between courts. Wachovia Bank v. Spitko (In re Spitko), 357 B.R. 272, 307 (Bankr. E.D. Pa. 2006) (collecting cases); Lewis v. Summers (In re Summers), 320 B.R. 630, 638 (Bankr. E.D. Mich. 2005) (non-debtor corporate records fall outside the scope of § 727(a)(3)); Sterling Int'l, Inc. v. Thomas (In re Thomas), 2003 WL 21981707, at *11 (Bankr. D. Idaho 2003) (records of closely held company are relevant under § 727(a)(3)). Courts opposed to denying a personal discharge under § 727(a)(3) based on a lack of corporate records strictly interpret the legal separation between a debtor and a wholly-owned business. In re Summers, 320 B.R. at 638; JP Morgan Chase Bank v. Hobbs (In re Hobbs), 333 B.R. 751, 757 (Bankr. N.D. Tex. 2006). Additionally, § 727(a)(7) allows for the denial of discharge for actions that violate § 727(a)(2)–(6) if the violation occurred within one year of a debtor's bankruptcy filing and involved an "insider," which is statutorily defined to include any "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. §§ 101(31)(A)(iv), 707(a)(7); In re Summers, 320 B.R. at 638. Therefore, if § 727(a)(7) encompasses § 727(a)(3) with respect to an "insider," then § 727(a)(3) should only apply to a debtor's personal records.[7] The refusal to allow business records to form the basis of a § 727(a)(3) discharge denial is the minority position.

Most courts analyzing the issue have adopted a nuanced approach, allowing business records from a closely related business to form the basis for the denial of a debtor's individual

[6] Section 727(a)(2)(A) allows for the denial of a debtor's discharge for transferring or concealing property within one year of a bankruptcy filing.

[7] The court notes that § 727(a)(3) and (a)(7) are materially different, as the look back period under § 727(a)(3) is either two years or a "reasonable period," while only one year under § 727(a)(7). Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia), 2007 WL 7540987 (B.A.P. 9th Cir. 2007).

discharge. See, e.g., Protos v. Silver (In re Protos), 322 Fed. App'x 930, 935 (11th Cir. 2009); Union Planters Bank, N.A. v. Connors, 283 F.3d 896, 900 (7th Cir. 2002); Peterson v. Scott (In re Scott), 172 F.3d 959, 970 (7th Cir. 1999); In re Halpern, 387 F.2d 312, 315 (2d Cir. 1968); Hussain v. Malik (In re Hussain), 508 B.R. 417, 424–25 (B.A.P. 9th Cir. 2014); Crocker v. Stiff (In re Stiff), 519 B.R. 665 (Bankr. E.D. Ky. 2014); Haupt v. Belonzi (In re Belonzi), 476 B.R. 899 (Bankr. W.D. Pa. 2012); Buckeye Ret. Co. v. Bishop (In re Bishop), 420 B.R. 841 (Bankr. N.D. Ala. 2009); CM Temp. Servs., Inc. v. Bailey (In re Bailey), 375 B.R. 410 (Bankr. S.D. Ohio 2007); In re Devaul, 318 B.R. 824; Pher Partners v. Womble (In re Womble), 289 B.R. 836, 857 (Bankr. N.D. Tex. 2003); In re Thomas, 2003 WL 21981707; Bowie v. Bowie (In re Bowie), 80 B.R. 99 (Bankr. N.D. Ohio 1987).

At least one court has focused on the language of § 727(a)(3), noting that the reference to a "debtor's . . . business transactions" suggests that the records of a debtor's closely held business are within the purview of the statute. In re Womble, 289 B.R. at 857. Most courts however have focused on the purpose of § 727(a)(3), which is to provide all records "needed in order for the bankruptcy trustee and creditors to have accurate information concerning the debtor's assets that might be available for liquidation." In re Spitko, 357 B.R. at 308. When a corporation and debtor are "closely connected," business records often become paramount to obtaining an accurate picture of a debtor's individual financial position. Id.; Blanchard v. Ross (In re Ross), 1999 WL 10019, at *4–5 (Bankr. E.D. Pa. 1999); In re Thomas, 2003 WL 21981707, at *11 ("[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."). Because § 727(a)(3) requires, as a precondition to discharge, that a debtor produce sufficient information allowing creditors to track the debtor's financial situation "with substantial completeness and accuracy for a reasonable time past to present," withholding business information substantially intertwined with the debtor's personal capacity completely ignores the purpose of the statute. In re Juzwiak, 89 F.3d at 427; In re Thomas, 2003 WL 21981707, at *10; In re Bishop, 420 B.R. 841. Section 727(a)(3) prevents creditors from having to guess about a debtor's actual financial position. Micro Connections, Inc. v. Shah (In re Shah), 388 B.R. 23, 32–33 (Bankr. E.D.N.Y. 2008); Union Bank of the Middle E., Ltd. v. Farouki (In re Farouki), 133 B.R. 769, 781 (Bankr. E.D. Va. 1991). Any other outcome would allow a closely held business to work as a shield, protecting relevant information "behind the veil of the corporate façade." In re Ross, 1999 WL 10019, at *5. Bankruptcy courts are also courts of equity that prefer substance over form. Id.; see also Pepper v. Litton, 308 U.S. 295, 305 (1939); In re Skiles, 504 B.R. 871 (Bankr. N.D. Ohio 2014) (holding that a debtor's household size for purposes of the "Means Test" should mirror a debtor's actual living circumstances). The court believes the majority position is the better reasoned approach. A lack of business records relating to a company substantially intertwined with a debtor may provide the basis for the denial of a debtor's individual discharge under § 727(a)(3).

The central questions then become whether a debtor and his business are sufficiently intertwined and if the lack of corporate records prevent a creditor from obtaining an accurate and complete view of the debtor's financial position. For example, commingling personal and corporate assets is clear evidence of a sufficient connection. Settembre v. Fidelity & Guar. Life Ins. Co., 2007 WL 4546669, at *3 (W.D. Ky. 2007); Vulcan Constr. Materials, LP v. Kibel (In re

Kibel), 2011 WL 1042575, at *11–12 (Bankr. W.D. Tex. 2011); In re Bailey, 375 B.R. 419. However, ignoring the corporate form is not a requirement. Courts have consistently held that financial information relating to a debtor's wholly owned corporation may create sufficient entanglement to require the production of adequate business records. In re Belonzi, 476 B.R. 899; In re Thomas, 2003 WL 21981707; In re Bishop, 420 B.R. 841; In re Spitko, 357 B.R. at 307–08. "Where a debtor has some degree of control over a closely held corporation, along with access to relevant corporate records, the records should be recoverable under [§ 727(a)(3)]." In re Ross, 1999 WL 10019, at *4. For example, in In re Belonzi, the debtor was the owner of a business that operated and restocked vending machines. 476 B.R. at 902–03. Because the debtor generated the vast majority of his income from the vending machine business, business records were "critical in determining the financial condition of the individual debtor." Id. at 904.

In the current case, Debtor is the 100% owner of Strasburg Leasing and appears to have generated essentially all of his prepetition income from BVK. While Debtor claims he was rarely involved in the financial aspects of his companies, Debtor was the owner and had access to his books and records. Strasburg Leasing likely had substantial equity on Debtor's petition date, an asset that is part of Debtor's bankruptcy estate. Not only would a fixed asset listing provide Trustee with a list of potential assets available to sell for the benefit of creditors, but it would also prevent Debtor from selling property outside the bankruptcy process. This is truly a situation where business records are needed to understand the debtor's personal financial condition. The court concludes that Debtor and his business entities are sufficiently intertwined to necessitate the production of corporate records, making Debtor's failure to produce such records sufficient to form the basis for a § 727(a)(3) discharge denial.

**B. UST Sufficiently Identified Debtor's Missing Records**

Because Debtor's lack of business records may form the basis for a denial of discharge under § 727(a)(3), the burden initially rests with UST to identify the records Debtor should have been able to provide, but failed to do so. In re Devaul, 318 B.R. at 830. The party seeking a denial of discharge must also demonstrate that the missing documents "might" provide insight into "the debtor's financial condition or business transactions." 11 U.S.C. § 727(a)(3). Therefore, the initial inquiry does not look into a debtor's justifications for his lack of records, but instead only if a debtor failed to produce information that might give creditors an insight into the debtor's financial situation. In re Devaul, 318 B.R. at 831.

In order to succeed on the first element of a §727(a)(3) claim, UST must explain Debtor's business structure and identify missing business records. UST's exhibits, as well as testimony from Trustee and Debtor, sufficiently outlined Debtor's trucking businesses. The entities were large, generating revenues and expenses in excess of three and four million dollars annually. Trucking businesses are also capital intensive, making accurate fixed asset records important for financial and tax records. Debtor failed to provide an adequate fixed asset listing. The listings provided by Debtor and Mr. Frantz only covered a small portion of Strasburg Leasing's fixed assets, and are woefully insufficient. Debtor also produced business tax returns, but failed to provide the level of documentary support the court would expect from businesses of the size and complexity seen in the current case. While not completely clear, it appears that Debtor closed the doors of his businesses only weeks or months before filing for bankruptcy, reducing the

likelihood that Debtor inadvertently lost or destroyed business records in the period between business closing and bankruptcy filing.

UST must also demonstrate that the missing records "might" allow a creditor to better ascertain Debtor's financial situation. 11 U.S.C. § 727(a)(3); In re Devaul, 318 B.R. at 833–34. While each entity is legally separate from Debtor, to the extent a corporation has equity (assets exceed liabilities), that business equity is an asset of a debtor's bankruptcy estate. In re Underhill, 498 B.R. 170, 177–79 (B.A.P. 6th Cir. 2013) (rev'd on other grounds Underhill v. Huntington Nat'l Bank (In re Underhill), 579 Fed. App'x 480 (6th Cir. 2014)); In re Saunier, 2012 WL 5898601, at *1 (Bankr. N.D. Ohio 2012); In re Liber, 2012 WL 1835164, at *4–5. Debtor allegedly attempted to sell Strasburg Leasing property to KTS, and if not discovered by Trustee, would have reduced Strasburg Leasing's equity and improperly moved property outside the bankruptcy process. Additionally, Debtor's recollection of the number of trucks and trailers owned by Strasburg Leasing continually changed, further obfuscating any creditor's view into Debtor's business equity. The fixed asset listing Debtor was unable or unwilling to provide prevented creditors from having an accurate representation of Debtor's business equity. UST satisfies its initial burden under § 727(a)(3).

**C. Debtor Failed to Justify His Lack of Financial Records**

While not clearly enumerated, Debtor's post-trial brief raises four justifications for his lack of business records. First, Debtor argues that his records are adequate for an unsophisticated debtor with little formal education. Closely related to the first justification, Debtor secondly argues that the records he provided give creditors a sufficient window into his financial picture. Third, Debtor argues that the combination of a roof collapse, flood, and computer virus destroyed his records. Finally, Debtor believes he justifiably relied on others to maintain his financial records, and the court should not deny his discharge based on the failure of others.

Because UST has satisfied its initial burden under § 727(a)(3), Debtor must now show that the records provided were "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). When evaluating a debtor's justifications, the court applies a hybrid objective and subjective standard, where the adequacy of a debtor's records are based on what a reasonable person with the same level of financial sophistication would maintain while also managing a business of similar size and complexity. In re Shattuck, 2012 WL 2884830, at *4. For example, a normal consumer debtor is not required to maintain in-depth financial records, and providing the trustee with bank and credit card statements is normally sufficient. Id. at *3; In re Roller, 2014 WL 644590, at *13. However, a financially sophisticated debtor running a business is require to maintain more complete records. In re Roller, 2014 WL 644590, at 14. While there is no set formula for determining what records a debtor must maintain, courts often evaluate the following factors: "the debtor's occupation, financial structure, education, experience, sophistication, and any other circumstances that should be considered in the interests of justice." Richland Trust Co. v. Haley (In re Haley), 2007 WL 3113333, at *5 (Bankr. N.D. Ohio 2007) (internal quotation marks omitted); see also Meridian Bank, 958 F.2d at 1231. There is no uniform manner in which a debtor's financial records must be maintained. In re Shattuck, 2012 WL 2884830, at *2. However, any records must be sufficiently organized to allow a creditor to make sense of the information. Id. "[N]either the court nor a creditor is required to reconstruct a debtor's financial

situation by sifting through a morass of checks and bank statements." Connors, 283 F.3d at 899; In re Juzwiak, 89 F.3d at 429 ("[T]he burden is not on the creditor to organize and reconstruct the debtor's business affairs."); WTHW Inv. Builders v. Dias (In re Dias), 95 B.R. 419, 423 (Bankr. N.D. Tex. 1988) (holding that requiring a creditor to reconstruct a debtor's records would "encourage the retention of voluminous receipts (in lieu of ledger books) to thwart creditors from determining the financial condition of the debtor"); In re Scott, 172 F.3d at 970 (holding that the production of excessive records creating "an impenetrable maze" obfuscating the debtor's financial activities may be sufficient to deny discharge). Because each determination is fact intensive, courts are granted wide discretion when evaluating the adequacy of a debtor's records. In re Shattuck, 2012 WL 2884830, at *2.

Under § 727(a)(3), the party seeking to deny a debtor's discharge need not show that the debtor acted with fraudulent intent when failing to produce adequate records. In re Schifano, 378 F.3d at 70. However, a debtor's untruthful or evasive statements may convince a court that any proffered justifications are inadequate. In re Ross, 1999 WL 10019, at *7. For example, in the case of In re Hallahan, the debtor was an insurance salesman who lied to his customers about his dissipation of assets. 1999 WL 33582620, at *6–7. The court concluded that in light of the debtor's untruthfulness, "[debtor's] failure to keep records can hardly be viewed as accidental." Id. at *7; see also Tow v. Henley (In re Henley), 480 B.R. 708, 783 (Bankr. S.D. Tex. 2012) ("[the debtor's] lack of credibility . . . renders her statement to be the equivalent of 'the dog ate my homework' excuse"); Lioce v. Heinz (In re Heinz), 501 B.R. 746, 767–68 (Bankr. N.D. Ala. 2013); Grange Mut. Ins. Co. v. Benningfield (In re Benningfield), 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989); In re Taubman, 1991 WL 225982, at *7 (Bankr. S.D. Ohio 1991).

The court first turns to Debtor's argument that his lack of financial sophistication justifies his lack of records. Debtor does not have a college education, but was nevertheless able to move from an entry level laborer to the owner of numerous business entities. Debtor's trucking operations are also quite large, topping four million dollars in annual revenues and expenses. Such success indicates a level of financial sophistication and business savvy. However, Debtor attempts to paints himself as an unsophisticated business person who avoided the financial aspects of his business as much as possible, delegating recordkeeping responsibilities and instead focusing on driving trucks. Information from trial partially undercuts Debtor's argument. For example, Mr. Ziegler testified that he negotiated the purchase of the McCracken Trailers with Debtor. Debtor also convinced First National, a successful local bank, to extend significant business financing. While the court has no evidence disputing Debtor's claim that he spent the majority of his time on the road, he still maintained a good handle on the overall financial health of his companies. Based on the above considerations and Debtor's testimony and demeanor at trial, the court finds that Debtor is reasonably sophisticated in financial matters, requiring records above that required by a normal consumer debtor. See Petro Concepts, Inc. v. Mundt (In re Mundt), 2009 WL 5386131, at *14–15 (Bankr. D. Idaho 2009). A fixed asset listing is one example of a document the court believes Debtor must be able to provide, but has failed to do so. Debtor's argument that his lack of financial sophistication excuses his failure to provide business records fails. These are records one must have to file tax returns.

Debtor's post-trial brief alludes to a justification that Debtor's production of a large amount of records entitles him to a discharge. This justification can be quickly disposed of. The

question is not what records a debtor produced, but what records a debtor failed to produce. In re Bailey, 375 B.R. at 420. Some courts have even gone so far as to deny a debtor's discharge based on the production of excessive and unorganized records. In re Scott, 172 F.3d at 970; In re Womble, 289 B.R. at 858. In any event, the records Debtor produced are not an adequate substitute for the lack of a fixed asset listing. The court finds this justification insufficient.

Debtor's final two justifications claim that: (1) some combination of a roof collapse, flood, or computer virus destroyed Debtor's records or (2) Debtor's lack of financial sophistication made his delegation of recordkeeping responsibilities reasonable, and Debtor should not be punished for his employees or agent's failure to maintain records. Debtor presented very little evidence or testimony substantiating either of these claims.

When evaluating a debtor's justifications, the trial court is given wide discretion to analyze the evidence and testimony presented at trial. While fraudulent intent is not an element under § 727(a)(3), a debtor's credibility may nevertheless have a large influence on a court's ultimate decision. The current case is one such example. The court notes inconsistencies, unlikely "coincidences," and difficult to believe explanations within Debtor's narrative. For example, in pretrial communications between Debtor, UST, and Trustee, Debtor claimed that a flood, roof collapse, or computer virus destroyed his records. Any of these justifications, if sufficiently based in evidence and testimony, might protect Debtor from a § 727(a)(3) discharge denial. However, Debtor provided no evidence at trial substantiating these justifications. Debtor also provided no evidence or testimony substantiating his accountant's independent loss of the same records. Similarly perplexing, even after the alleged computer virus ruined Debtor's computer system, is Debtor's ability to produce periphery financial reports with little importance to the bankruptcy case. Coincidentally, all the information pertaining to the heart of Debtor's enterprises that would most help creditors construct Debtor's financial activities, was destroyed. Additionally, Debtor's representations before and during trial regarding Strasburg Leasing's vehicle ownership are inconsistent. Many of Debtor's statements regarding his ownership of tractors and trailers appear self-serving, increasing in number as third parties discovered additional trailers. For example, only after Trustee independently discovered the McCracken Trailers did Debtor disclose his prior ownership and alleged transfer to KTS. The court notes that the State of Ohio requires heavily damaged vehicles to be repaired before the State will issue a new vehicle title. Debtor and Ms. Kinsey explained that many of the trailers allegedly transferred between Strasburg Leasing and KTS were badly damaged, and therefore the State of Ohio would not issue a new title until repairs were made. This testimony is credible and buttressed by photographs of the McCracken Trailers in various states of disrepair. However, the court finds Debtor's testimony regarding the date and amount of any alleged transfer between Strasburg Leasing and KTS far less convincing. Because of the damage to the McCracken Trailers, Debtor's method of transfer was to endorse the back of the vehicle title over to KTS, a transfer method with no means to independently verify when the transfer occurred. Both Debtor and Ms. Kinsey could not remember the exact date of any transfers. It is also unclear if any money or other assets changed hands at the time of the Strasburg Leasing to KTS transfers. Furthermore, Debtor owned a pick-up truck valued at $3,152.00 that he failed to disclose until the truck was independently discovered inside a van (box style trailer) by Trustee. In isolation, the court may overlook any one of the above problems, or simply attribute it to a bad memory. However, when

considered as a whole, the court finds Debtor not to be a credible witness. See In re Shattuck, 2012 WL 2884830, at *2.

The court now turns to Debtor's justification that a roof collapse, flood, or computer virus destroyed his records. As noted above, Debtor's failure to provide any documentary evidence substantiating any of these claims is incredibly unusual. The court would expect Debtor to produce photographs or an insurance document if a flood or roof collapse actually occurred. Based on Debtor's lack of credibility and lack of evidence, the court rejects these justifications.

Debtor's final argument is that his lack of financial sophistication made his delegation of recordkeeping responsibilities reasonable, and he should not be punished for his employees or agent's failures. Debtor offered little testimony or other evidence supporting his reliance on others. As noted above, the validity of any § 727(a)(3) justification is a fact-intensive inquiry. U.S. Tr. v. Welling (In re Welling), 2012 WL 1965664, at *6 (Bankr. N.D. Ohio 2012); In re Devaul, 318 B.R. at 837. Therefore, it is unsurprising that the reasonableness of a debtor's decision to delegate record keeping responsibilities has resulted in a wide range of outcomes. Compare In re Welling, 2012 WL 1965664 (holding that an unsophisticated debtor's reliance on his former mother-in-law to maintain his business records was reasonable), with In re Bailey, 375 B.R. at 418 n.3 ("To the extent the Debtor is arguing he is not responsible for producing business records simply because he employed an accountant, . . . the court rejects this explanation as wholly inadequate under the requirements of § 727(a)(3)."); 6 Collier on Bankruptcy, ¶ 727.03[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013) (holding that "if the debtor leaves the conduct of his or her business and the keeping of books or accounts to an agent, the debtor is responsible for the failure to keep proper books or records"). The theme unifying the case law is the amount of fault attributable to the debtor.

For example, in In re Welling, the debtor was a thirty-year-old with a high school education who, after spending time primarily working as a laborer, decided to open a logging company. 2012 WL 1965664, at *1. The debtor handled the physical labor, at times managing a team of up to six employees, while his mother-in-law (now former mother-in-law), an accountant by trade, handled the finances. Id. Even though the debtor's business ran into difficulties, the debtor nevertheless remained "hands-off" with the financial aspects of his business, trusting his mother-in-law. Id. at *2. Unfortunately, the company did not succeed, and the debtor filed bankruptcy, leading the United States trustee to file a § 727(a)(3) action based on the debtor's lack of business records. Id. at *1. The court determined that the debtor's reliance on his mother-in-law was reasonable, especially considering her financial background and the debtor's lack of sophistication. Id. at 6. The court focused on the mother-in-law's failure, even after repeated requests, to provide the trustee or creditors with the financial records she maintained. Id. Important to the court's decision was the existence of a debt between the debtor and mother-in-law, giving the mother-in-law an incentive to withhold records in the hopes that the debtor's discharge would be denied. Id. While the court noted that the debtor from In re Welling could have been more proactive in the financial dealings of his company, the court emphasized the debtor's helpfulness in other aspects of his case, and granted the debtor's discharge. Id. at *7. Similarly, in In re Zell, the debtor was involved in the financial dealings of her clothing retail company, but employed an accountant to help create and maintain records. 108 B.R. at 619–20. However, when the trustee requested financial records, the debtor was unable to provide them.

Id. at 627. Ultimately, the court excused the debtor's shortcomings based on extenuating circumstances. Id. First, the debtor leased her clothing retail locations from her ex-husband (who was her husband at the beginning of their business relationship), and after a personal falling-out, the debtor was locked out of her stores and therefore lacked access to her financial records. Id. at 621. Before the debtor could retrieve her records, a robbery occurred where many records were stolen or destroyed. Id. While the debtor could have been more proactive in maintaining and safeguarding records, the court did not deny her discharge based in large part on her ex-husband's bad acts. Id. at 627–28. In both In re Welling and In re Zell, the court determined that the debtor's failure to provide records, while partly attributable to the debtor, was more accurately attributed to external factors for which the debtor should not be held accountable. See In re Henley, 480 B.R. at 783 (holding that lost or destroyed must be outside the debtor's control before such loss will justify a lack of records under § 727(a)(3)); In re Moreo, 437 B.R. at 57. The court notes that a debtor running a company, especially a large company, may not be directly involved in the creation and maintenance of financial records. Such delegation of responsibility is completely normal and entirely acceptable under § 727. However, a business owner is ultimately responsible for his business, requiring a debtor to take actions to maintain and protect business records in-line with the debtor's level of financial sophistication. See In re Hallahan, 1999 WL 33582620, at *6–7.

The court will assume, *only* for the sake of the foregoing analysis, that Debtor's delegation of recordkeeping responsibilities was reasonable. However, the court finds that Debtor did not take the necessary actions to assure his employees or agents maintained financial records. The court believes Debtor's testimony that he spent the majority of his time dealing with the operational side of his business. However, being heavily involved in one aspect of a business does not alleviate a business owner's responsibility to monitor his company's overall financial health. In re Bailey, 375 B.R. at 418 n.3 (holding that blaming an accountant who was never an officer of the debtor's company for a lack of business records is "wholly inadequate"). While In re Welling and In re Zell both excused a debtor's actions in failing to adequately protect financial records, both cases involved outside factors with no parallel in the current case. Mr. Frantz, Debtor's tax accountant, failed to produce anything but very high level summary information, which is insufficient. In re Hussain, 508 B.R. at 425. There is no evidence that Mr. Frantz withheld information in an effort to harm Debtor and help himself, unlike In re Welling. Also in direct contrast with In re Welling and In re Zell, Debtor was unhelpful during the bankruptcy process and his testimony at trial was not credible. Debtor also likely reviewed his business tax returns, which requires at least a cursory examination of the underlying documents. Debtor could not adequately review his tax return, and the associated depreciation expense, without a fixed asset listing. A debtor owning a multi-million dollar business should not be able to hide behind his employees or agents when justifying a lack of financial records.

UST has successfully shown that Debtor failed to provide records that would give creditors and Trustee an accurate view into Debtor's financial records. Creditors are not required to guess at a debtor's financial condition, and that is exactly what occurred in the current case. The combination of the lack of a fixed asset listing, Debtor's failure to adequately explain his loss of records, Debtor's financial sophistication, and questions surrounding Debtor's credibility convince the court that Debtor's discharge should be denied under § 727(a)(3). The court need not evaluate UST's denial of discharge arguments under other Code sections.

## Conclusion

Based on the above reasoning, Debtor's discharge is **DENIED** under § 727(a)(3). Therefore, UST's arguments pertaining to the denial of Debtor's discharge under other portions of § 727(a) need not be evaluated.

It is so ordered.

# # #

**<u>Service List</u>**:

**Bruce Edward Kandel**
420 Gasser Circle NW
New Philadelphia, OH 44663

**James R Kandel**
101 Central Plaza S
Ste 1003
Canton, OH 44702-1433

**United States Trustee**
United States Trustee
Suite 441
H.M. Metzenbaum U.S. Courthouse
201 Superior Avenue
Cleveland, Oh 44114

**Scott R. Belhorn ust35**
Office of the US Trustee
Howard M. Metzenbaum U.S. Courthouse
201 Superior Avenue East
Suite 441
Cleveland, OH 44114-1240

**Anne Piero Silagy, Esq**
Canton
1225 South Main St
Suite 1
North Canton, OH 44720